IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 17-00111-01-CR-W-HFS |
| ) | |
| EMMANUEL ROBINSON, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Emmanuel Robinson's Motion to Suppress (doc #29). For the reasons set forth below, it is recommended that the motion be denied.

I. BACKGROUND

On March 13, 2017, a criminal complaint was filed against defendant Emmanuel Robinson. On March 29, 2017, the Grand Jury returned a one-count indictment against defendant Robinson charging defendant with being a felon in possession of a firearm.

An evidentiary hearing on the motion to suppress was held on September 21, 2017. Defendant Robinson was represented by appointed counsel Alex S. McCauley. The Government was represented by Assistant United States Attorney Bradley K. Kavanaugh. The Government called Detective William Hooley and Detective David Kellgren of the Kansas City, Missouri Police Department as witnesses. The defense called Davionne Cazzell Harvey, Jr. to testify.

II. FINDINGS OF FACT

On the basis of the evidence presented at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. Detective William Hooley and Detective David Kellgren are partners who work in the Vice Unit of the Kansas City, Missouri Police Department. (Tr. at 9, 44) Some of the crimes which the Vice Unit is responsible for policing are party houses, prostitution, and liquor. (Tr. at 9, 45)

2. On March 10, 2017, at approximately 11:30 a.m., Detective Hooley and Detective Kellgren went to 11611 Hickman Mills Drive, Kansas City, Missouri to contact Davionne Harvey. (Tr. at 9-10, 45) Detective Hooley had past dealings with Mr. Harvey. (Tr. at 10) Detective Hooley testified that Mr. Harvey had run illegal house parties at several different locations where there had been numerous neighbor complaints, prostitution occurring inside the houses, and some parties ending in shootings. (Tr. at 10) Detective Hooley had met with Mr. Harvey in the past to get those parties stopped. (Tr. at 10) Detective Hooley testified that he had information that another illegal house party was being started, so he and Detective Kellgren went out to talk to Mr. Harvey to tell him to squash it before it started. (Tr. at 10-11, 45)

3. When Detective Hooley and Detective Kellgren arrived at 11611 Hickman Mills Drive, they pulled into the parking lot and parked their vehicle. (Tr. at 11) Detective Hooley described the business as a makeshift used car lot.[1] (Tr. at 11) Detective Hooley observed Mr. Harvey down at the other end of the parking lot standing in front of a Corvette. (Tr. at 11) Detective Hooley testified that he had met with Mr. Harvey in person one time prior to March 10, 2017, and had also talked to him on the phone. (Tr. at 11) The officers, who were wearing normal street clothes, walked towards Mr. Harvey. (Tr. at 10-11, 45) Detective Hooley testified that he reminded Mr. Harvey of who he was and that Harvey responded that he knew. (Tr. at 11) Mr. Harvey testified that while he did not initially know that the men approaching him were officers, he knew who Detective Hooley was after a couple words into the conversation. (Tr. at 77) Detective Hooley introduced his partner, Detective Kellgren, to Mr. Harvey. (Tr. at 12) Detective Hooley told Mr. Harvey that he was not in trouble, but asked if Harvey would talk with the officers about this house party. (Tr. at 11-12) The officers wanted to talk with Mr. Harvey privately so they headed towards their vehicle. (Tr. at 12) Detective Hooley testified, "I don't like to put people's business out there if I don't have to mostly. Since I'm in plain clothes, we'll just do it very low key." (Tr. at 12) Mr. Harvey agreed to talk with the officers, but said that he wanted to give a ring full of keys that he was carrying to one of his guys. (Tr. at 12, 46)

---

[1] Mr. Harvey testified that they fix cars, repair cars, restore cars and sell cars at the business. (Tr. at 63) Mr. Harvey was a supervisor. (Tr. at 63)

4. Mr. Harvey walked up to a man (defendant Robinson)[2] standing beside a white SUV in the parking lot and handed him the keys. (Tr. at 12, 46) Mr. Harvey then turned around and began to walk back towards the officers when Robinson shoved Harvey really hard in the back,[3] causing Harvey to stumble forward, and yelled, "Are we going to do this right here; are we going to do this right now?" (Tr. at 13, 46-47) While Robinson was yelling, he was motioning towards his waistband with his hand, like he was going to draw a weapon.[4] (Tr. at 13, 46) At that point, the officers pulled out their badges, identified themselves as police, and said stop. (Tr. at 13, 46) Detective Hooley testified that he announced himself as law enforcement to stop the physical confrontation. (Tr. at 16) Detective Hooley testified that he exposed his weapon because he believed that Robinson had a weapon. (Tr. at 13) Detective Hooley testified that he had just witnessed an assault and that he wanted to make sure that Mr. Harvey did not end up getting shot while Hooley was standing right there. (Tr. at 16, 21-22, 37) Detective Hooley testified that he was also concerned for his partner's and his own safety. (Tr. at 16-17) Detective Kellgren testified that he had just witnessed an assault and felt that he needed to diffuse the situation quickly before somebody got hurt. (Tr. at 48)

5. Detective Hooley testified that he "kept telling him [defendant Robinson] back up, man, back up, don't do it, back up." (Tr. at 17) Detective Hooley testified that Robinson started to back up, but he kept his hand at his waistband the whole time. (Tr. at 17) Detective Kellgren testified that Robinson was still making the movements toward his waistband. (Tr. at 48) Detective Kellgren testified that in his experience, handguns are commonly concealed in a person's waistband. (Tr. at 48) Detective Kellgren was concerned for everyone's safety because he thought that Robinson might be armed. (Tr. at 48-49) Detective Kellgren grabbed defendant Robinson and Detective Hooley grabbed Mr. Harvey. (Tr. at 17, 48) Detective Hooley testified that he grabbed Mr. Harvey because he figured if there was going to be a fight where one person had a gun, there was a possibility that they both had guns. (Tr. at 18) Detective Hooley wanted to maintain the status quo of

---

[2]Detective Hooley and Detective Kellgren each testified that they had never had any contact with defendant Robinson before that morning. (Tr. at 20, 30, 46) Mr. Harvey testified that Robinson was one of the employees that he supervised. (Tr. at 63)
[3]Mr. Harvey testified that defendant Robinson did place his hands on Harvey, that there was physical contact, and that the detectives witnessed that physical contact. (Tr. at 80)
[4]Detective Hooley testified:

Before I became a detective, I was a street officer for several years in Metro Patrol Division and then a TOPS unit. We dealt with a lot of armed people, and a common place to keep [a weapon] is right in the front waistband. … When he was motioning like that, I've seen it a million times. He has a gun.

(Tr. at 14)

3

6. Detective Kellgren frisked defendant Robinson and said, "Gun. I've got a gun." (Tr. at 18-19) The gun was in Robinson's front waistband, the same location where the officers observed Robinson place his hand immediately after shoving Mr. Harvey and the same location where Robinson continued to hold his hand after the officers produced their badges and announced that they were law enforcement. (Tr. at 20, 51) The gun, a .40-caliber handgun, was loaded with a round in the chamber. (Tr. at 29, 51) Detective Hooley did a pat-down of Mr. Harvey. (Tr. at 18) Mr. Harvey was not armed. (Tr. at 19) Detective Hooley testified that after Detective Kellgren found the gun on Robinson, Mr. Harvey said, "Hey, man, that's my friend. It's not a big deal. It's not a big deal. He's fine."[5] (Tr. at 20, 37)

7. After Detective Kellgren located the gun on defendant Robinson, Kellgren retrieved the gun and placed Robinson in restraints. (Tr. at 21) The officers ran Robinson's name through dispatch and learned that Robinson was a convicted felon. (Tr. at 21) The officers then called Detective Manley, who works for the illegal firearms squad, to do more research on Robinson's past charges and convictions. (Tr. at 21) A uniformed patrol unit responded to the location to transport Robinson. (Tr. at 21)

8. At the time he was detained, defendant Robinson stated that he had just gotten out and that he could not handle this charge. (Tr. at 30) Detective Hooley testified that this statement by Robinson was not made in response to any questions by the officers. (Tr. at 41)

## III. DISCUSSION

Defendant Robinson seeks to suppress all evidence, and any testimony related to such evidence, obtained as a result of the search of defendant on March 10, 2017. (Motion to Suppress (doc #29) at 1) Defendant argues that there was no reasonable suspicion or probable cause to justify his seizure, detention and pat down. (Id. at 4) "It was merely two friends joking around and no criminal activity was afoot, and Mr. Robinson was on private property moving away from the officers when he was stopped." (Id.)

---

[5] Mr. Harvey testified that he tried to explain before defendant Robinson was frisked that Robinson was just playing around. (Tr. at 70) Mr. Harvey further testified that Robinson did not make a furtive movement towards his waistband. (Tr. at 73)

4

A police officer may stop a person if the officer has a reasonable, articulable suspicion of criminal activity. See United States v. Banks, 553 F.3d 1101, 1104 (8th Cir. 2009)(citing Terry v. Ohio, 392 U.S. 1, 21 (1968)). When a person commits a crime in the presence of an officer, even a minor offense, that conduct gives the officer, at the very least, the authority to stop the person to advise him of the violation. See Banks, 553 F.3d at 1104. In Banks, officers observed the defendant riding his bicycle at night without a headlight, a petty misdemeanor. Id. The court found that the officers lawfully stopped the defendant in accordance with Terry. Id. Further, the court found that after making a lawful Terry stop, the officers may then frisk the person for the protection of themselves or others nearby to discover weapons if the officers have a reasonable, articulable suspicion that the person may be armed and presently dangerous. Id. at 1105.

Based on the evidence presented at the hearing, the Court finds that Detective Hooley and Detective Kellgren went to Davionne Harvey's place of employment to talk with Harvey. (Fact Nos. 2 and 3) Mr. Harvey agreed to talk with the officers, but first wanted to give a ring full of keys that he was carrying to one of his employees. (Fact No. 3) Mr. Harvey handed off the keys, turned around and began to walk back towards the officers when defendant Robinson pushed Harvey, yelled at Harvey, and motioned towards his waistband with his hand, like he was going to draw a weapon.[6] (Fact No. 4) Detective Hooley and Detective Kellgren both believed that they had witnessed an assault[7] and that Robinson had a weapon based on their years of experience with

---

[6] The Court discounts the testimony of Mr. Harvey who testified that defendant Robinson did not make a furtive movement towards his waistband (Fact No. 6, n. 5) as this testimony is in conflict with that of the officers (Fact Nos. 4, 5 and 6) and because Harvey had his back turned on Robinson when he was shoved (Fact No. 4).

[7] A person commits the offense of assault in the fourth degree if:

(1) The person attempts to cause … physical injury [or] physical pain … to another person;

5

people who are armed. (Fact Nos. 4 and 5) Detective Kellgren frisked Robinson and found a loaded handgun in Robinson's front waistband. (Fact No. 6)

Regardless of whether defendant Robinson was merely "joking around," the Court finds that the officers reasonably believed that they had just witnessed an assault, thus, giving the officers the authority to conduct a <u>Terry</u> stop. Defendant Robinson's actions in motioning towards his waistband with his hand gave the officers a reasonable, articulable suspicion that Robinson may be armed and presently dangerous. Therefore, the officers were justified in frisking defendant Robinson for the protection of themselves and others nearby while conducting the stop.

Even if the officers did not have a sufficient basis for a <u>Terry</u> stop, the frisk which resulted in officers locating the weapon would still be lawful in the circumstances of this case. A frisk for officer safety does not depend on whether there was justification for a <u>Terry</u> stop. As set forth in <u>United States v. Davis</u>, 202 F.3d 1060, 1062 (8th Cir.), <u>cert. denied</u>, 531 U.S. 883 (2000), an investigative stop and a protective frisk have distinct law enforcement justifications. The danger to officer safety that justifies a protective search may arise during a consensual encounter. <u>Id.</u> at 1063. <u>See also</u> <u>United States v. Ellis</u>, 501 F.3d 958, 961 (8th Cir. 2007)("Justification for a protective pat-down based upon a fear for officer or bystander safety can arise after the commencement of … a consensual encounter.") In <u>Ellis</u>, officers went to Connie Miller's house

---

\* \* \*

(3) The person purposely places another person in apprehension of immediate physical injury; [or]

\* \* \*

(6) The person knowingly causes physical contact with another person knowing the other person will regard the contact as offensive or provocative.

Mo. Rev. Stat. § 565.056.

6

Case 4:17-cr-00111-DGK    Document 65    Filed 10/11/17    Page 6 of 8

to follow up on an investigation. 501 F.3d at 961. Ms. Miller invited the officers into her house which commenced a consensual encounter between the occupants of the house and the officers. Id. Ellis, who was sitting in the living room, began to act nervously, would not respond to the question if he was carrying a weapon, and moved his hand near his front pocket. Id. at 959. An officer informed Ellis that he was going to conduct a pat-down search to ensure the safety of the officers. Id. Ellis told the officer that he was not going to allow that and attempted to leave. Id. at 960. The court found that by the time Ellis made the attempt to leave, his behavior had already raised a reasonable suspicion that he was potentially armed, justifying the officer's decision to conduct a pat-down search for his and his partner's safety. Id. at 962.

In the present case, Detective Hooley and Detective Kellgren were engaged in a consensual encounter with Davionne Harvey. Mr. Harvey had agreed to talk with the officers and had turned to walk towards them when defendant Robinson's behavior caused the officers to believe that Robinson was potentially armed. (Fact Nos. 3, 4 and 5) The officers were justified in frisking defendant Robinson for the protection of themselves and others nearby.

## IV. CONCLUSION

No constitutional violation took place in the frisk and subsequent arrest of defendant Robinson. Therefore, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Robinson's Motion to Suppress (doc #29).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve timely objections shall bar an attack on appeal of the factual findings in this Report and

Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

                                                */s/ Sarah W. Hays*
                                                SARAH W. HAYS
                                      UNITED STATES MAGISTRATE JUDGE